REQUESTED ORAL ARGUMENT NOT SCHEDULED

Case No. 14-5121

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

NATIONAL ASSOCIATION OF
HOME BUILDERS, et al.,

                Appellants

      v.

UNITED STATES FISH AND
WILDLIFE SERVICE
     and
SALLY JEWELL, in her official capacity as
Secretary, U.S. Department of the Interior


            Appellees.
_____

**BRIEF OF APPELLANT**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 1:12-cv-02013-EGS, JUDGE EMMET SULLIVAN

HOLLAND & KNIGHT LLP

   /s/
_____
Rafe Petersen (Bar # 465542)
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955 3000
Facsimile: (202) 955 5564
E-mail: rafe.petersen@hklaw.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rule 12 and D.C. Cir. Rule 28(a)(1), Appellants National Association of Home Builders, Olympia Master Builders, Home Builders Association Of Greater Austin, and Texas Salamander Coalition, Inc. submit the following Certificate as to the Parties, Rulings, and Related Cases:

## 1.     Parties

Appellants are the National Association of Home Builders, Olympia Master Builders, Home Builders Association Of Greater Austin, and Texas Salamander Coalition, Inc.

Appellees are the United States Fish and Wildlife Service ("the Service") and Sally Jewell, in her official capacity as Secretary of the U.S. Department of the Interior.  Sally Jewell is the Secretary of the Interior and is sued in her official capacity.[1]  The Service is an agency within the Department of the Interior.

## 2.     Ruling Under Review

The ruling under review is Judge Emmet G. Sullivan's March 31, 2014 Memorandum Opinion and Order granting Appellees'/Defendants' Motion to Dismiss.  *National Association of Homebuilders v. United States Fish and Wildlife Service*, 12-cv-02013-EGS. (App. 135-61.)

---

[1] This Complaint was initially brought against Secretary Kenneth Salazar, the former Secretary of the Interior, in his official capacity.  Secretary Jewell was substituted pursuant to Fed. R. Civ. P. 25(d).

### 3.     Related Cases

*Wildearth Guardians v. Salazar*, Case No. 1:10-MC-00377-EGS (D.D.C.) is related to the case on appeal.   Appellants seek to challenge the Settlement Agreements entered by that court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Cir. Rule 26.1, Appellants declare that there are no parent companies, subsidiaries, or affiliates of any appellant that have outstanding securities in the hands of the public.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

TABLE OF CONTENTS.................................................................................. iii

TABLE OF AUTHORITIES .............................................................................iv

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE............................................................................1

    **A.**    STATUTORY BACKGROUND:  THE ENDANGERED SPECIES ACT...............4

    **B.**    THE SETTLEMENT AGREEMENTS .........................................................9

    **C.**    CASE PROCEEDINGS .........................................................................11

SUMMARY OF THE ARGUMENT ..................................................................13

ARGUMENT ....................................................................................................14

    A.    STANDARD OF REVIEW ....................................................................15

    B.    THE INJURY-IN-FACT ELEMENT OF ARTICLE III STANDING IS
        SATISFIED.........................................................................................16

        **1.**    Appellants' Concrete Interests Are Affected by the Service's
            Action...................................................................................18

            a.    Property Interests .......................................................18
            b.    Conservation Expenditures...........................................21

        **2.**    The Challenged Agency Action Denies Procedural Rights
            In a Manner That Directly Impact the Appellants' Interests.....24

            a.    Withdrawal of "Warranted but Precluded"
                Classification ............................................................25
            b.    Loss of Opportunity to Comment on Priority Issues
                and realize the benefits of such efforts...........................28
            c.    Acceleration of Listing Decision...................................36

        **3.**    "Zone of Interests" Considerations Provide No Basis To
            Deny Standing........................................................................37

    **D.**    THE CAUSATION ELEMENT OF ARTICLE III STANDING IS SATISFIED....40

    **E.**    THE REDRESSABILITY ELEMENT OF ARTICLE III  STANDING IS
        SATISFIED.........................................................................................42

CONCLUSION ..................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Alliance of Senior Citizens of Greater Phila. v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986)............................................................17

*Alaska Dep't of Envtl. Conservation v. Envt'l Protection Agency*,
    540 U.S. 483 (2004)...........................................................................25

*Barnum Timber Co. v. Envt'l Protection Agency*,
    633 F.3d 894 (9th Cir. 2011) ............................................................20

*Bennett v. Spear*,
    520 U.S. 154 (1997)...................................................... 28, 37, 38-43**

*Bonnichsen v. United States*,
    367 F.3d 864 (9th Cir. 2004) ............................................................38

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001) ............................................................44

*Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
    75 F.3d 1429 (10th Cir. 1996) .........................................................27

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) ......................................................26, 41

*Cnty. of San Miguel, Colo. v. MacDonald*,
    244 F.R.D. 36 (D.D.C. 2007)...........................................................20

*Comm. to Save the Rio Hondo v. Lucero*,
    102 F.3d 445 (10th Cir. 1996) .........................................................41

*Defenders of Wildlife v. Jewell*,
    — F. Supp. 3d —, CV 13-0919 (RC), 2014 WL 4829089
    (D.D.C. Sept. 30, 2014) ..............................................................21, 23

*Defenders of Wildlife v. Perciasepe*,
  714 F.3d 1317 (D.C. Cir 2013) ............................................................12

*In re Endangered Species Act Section 4 Deadline Litig.*,
  704 F.3d 972, 976 (D.C. Cir. 2013) ................................................2, 9, 12

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ..........................................................40, 42

*Fund for Animals v. Norton*,
  322 F.3d 728 (D.C. Cir. 2003) .........................................................23, 38

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
  529 F. Supp. 2d 1110 (N.D. Cal. 2007) ..............................................18, 20

*Idaho Conservation League v. Mumma*,
  956 F.2d 1508 (9th Cir. 1992) ...............................................................27

*Idaho Power Co. v. Fed. Energy Regulatory Comm.*,
  312 F.3d 454 (D.C. Cir. 2002) ...............................................................42

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*,
  338 F.3d 1024 (D.C. Cir. 2003) .............................................................15

*Int'l Bhd. of Teamsters v. Pena*,
  17 F.3d 1478 (D.C. Cir. 1994) ...............................................................34

*Loggerhead Turtle v. Volusia*,
  148 F.3d 1231 (11th Cir. 1998) .............................................................41

*Louisiana Energy & Power Auth. v. Fed. Energy Regulatory Comm.*,
  141 F.3d 364 (D.C. Cir. 1998) ...............................................................35

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................16, 28, 41, 44**

*Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*,
  CIV.A. 13-234, 2014 WL 4186777 (E.D. La. Aug. 22, 2014) ......................19

*Massachusetts v. Envt'l Protection Agency*,
  549 U.S. 497 (2007) ...........................................................................43

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014)..........................................................34

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engrs.*,
    539 F. Supp. 2d 331 (D.D.C. 2008)...............................................20\*\*

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engrs.*,
    417 F.3d 1272 (D.C. Cir. 2005).....................................................19\*\*

*Nat'l Wildlife Fed'n v. Norton*,
    386 F. Supp. 2d 553 (D. Vt. 2005) ..................................................25

*Nat'l Ass'n of Home Builders v. Envt'l Protection Agency,*
    667 F.3d 6 (D.C. Cir. 2011).............................................................17

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
    522 U.S. 479 (1998).........................................................................40

*Nat'l Parks Conservation Assoc. v. U.S. Envt'l Protection Agency*,
    759 F.3d 969 (8th Cir. 2014) ...........................................................38

*Nat'l Treasury Emp. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996).......................................................29

*In re Navy Chaplaincy*,
    534 F.3d 756 (D.C. Cir. 2008).........................................................17

*New World Radio, Inc. v. Fed. Commc'n. Comm'n.*,
    294 F.3d 164 (D.C. Cir. 2002).........................................................29

*Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*,
    714 F. Supp. 2d 73 (D.D.C. 2010)....................................................19

*Pac. Rivers Council v. Brown*,
    No. CV 02-243-BR, 2002 WL 32356431 (D. Or. Dec. 23, 2002) ....................43

*Pub. Citizen v. Lockheed Aircraft Corp.*,
    565 F.2d 708 (D.C. Cir. 1977).........................................................18

*Safari Club Int.'l v. Salazar*,
    82 F.R.D. 32 (D.C. Cir. 2012) .........................................................24

*Safe Extensions, Inc. v. Fed. Aviation Admin.*,
  509 F.3d 593 (D.C. Cir. 2007)............................................................46

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010)........................................................17, 23

*Sierra Club v. Envt'l Protection Agency*,
  292 F.3d 895 (D.C. Cir. 2002)............................................................20

*Sierra Club v. Marita*,
  46 F.3d 606 (7th Cir. 1995) .........................................................28, 36

*Sierra Club v. Robertson*,
  28 F.3d 753 (8th Cir. 1994) ...............................................................29

*Strahan v. Coxe*,
  127 F.3d 155 (1st Cir. 1997)...............................................................43

*Sugar Cane Growers Co-op. of Fl. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002)..............................................................44

*TOMAC v. Norton*,
  193 F. Supp. 2d 182 (D.D.C. 2002).....................................................18

*Yesler Terrace Cmty. Council v. Cisneros*,
  37 F.3d 442 (9th Cir. 1994) ...............................................................35

**Statutes**

5 U.S.C. § 702.........................................................................................1

5 U.S.C. § 706.........................................................................................1

16 U.S.C. § 1531-1544 ........................................... 1, 4, 5, 6, 8, 34, 39

28 U.S.C. § 1291.....................................................................................1

28 U.S.C. § 1331.....................................................................................1

28 U.S.C. § 2201, et. seq. ......................................................................1

**Other Authorities**

48 Fed. Reg. 43098 (September 21, 1983) ....................................................8

75 Fed. Reg. 69222 (Nov. 10, 2010)..........................................................5

76 Fed. Reg. 66370-66439 (October 26, 2011)..........................................6, 7, 8, 32

77 Fed. Reg. 15352-01 *et. seq.* (March 15, 2012) ........................................3, 33, 38

77 Fed. Reg. 69994-01 (November 21, 2012) ........................................32

79 Fed. Reg. 42525 (July 22, 2014)..........................................................33

*Authorities chiefly relied upon.

# GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Appendix | App. |
| Candidate Notice of Review | Notice of Review |
| Defendants-Appellees | Appellees |
| Endangered Species Act | the Act |
| Plaintiffs-Appellants | Appellants |
| United States Fish and Wildlife Service | the Service |
| United States Secretary of the Interior | the Secretary |

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Specifically, the Complaint states claims under 16 U.S.C. §§ 1540(c) and (g), 1, 28 U.S.C. § 2202, and 5 U.S.C. §§ 702 and 706.

Jurisdiction of this Court is invoked under 28 U.S.C. § 1291 as an appeal from a final order of the United States District Court for the District of Columbia that disposes of all parties' claims.  A notice of appeal was timely filed on May 22, 2014 in accordance with Rule 4(a) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

The issue on appeal is whether the district court erred in granting Appellees' Motion to Dismiss and finding that Appellants lacked standing to challenge final agency actions where their Complaint alleged concrete injury to their members' conservation, property, and business interests.

## STATEMENT OF THE CASE

This appeal involves one of the most fundamental rights of landowners and small businesses -- the right to participate in the regulatory processes that affect their property and livelihoods.  In 2011, the United States District Court for the District of Columbia approved two separate stipulated settlement agreements to resolve litigation brought by two environmental advocacy groups against the

United States Fish and Wildlife Service (the "Service").[2]   The Settlement Agreements in those cases fundamentally alter the manner and order in which the Service considers the regulatory status of 251 species pursuant to the Endangered Species Act.

Whether nor not a species is put on the list of "endangered" species or is a "candidate" to be proposed as endangered (with listing precluded by other higher priority listing activities) has an obvious impact on the regulatory status of the land on which such species feeds, breeds or shelters.  A large percentage of protected species feed, breed or shelter on private property.  Consequently, during the process for making a final determination as to whether or not a species should be listed as "endangered," the Service incentivizes private landowners to take actions, such as protecting the habitat, in order to reduce threats to species.  In turn, the Act has a coercive effect on state and local land use authorities by inducing such agencies to incorporate species protection measures into their approvals, including prior to such species being listed.  As a result, Appellants' members engage in long-range conservation efforts, fund studies, and provide information related to the status of species proposed for listing.  (App. 85-86.)  The Service has made clear that "everyone benefits" from such actions -- species benefit from early action

_____

[2] *See In re Endangered Species Act Section 4 Deadline Litig.* MDL No. 2165, Misc. Action No. 10-377 (D.D.C. 2010), WildEarth Guardians Settlement Agreement (App. 34-59.); and Center for Biological Diversity Settlement Agreement (App. 60-74.).

to address threats to their survival, landowners and other regulated interests avoid the imposition of potentially costly restrictions on their activities, and the Service avoids the need to dedicate scarce government resources to regulate additional species.[3]

By entering into the Settlement Agreements, the Service ended over 35 years of public process and significantly curtailed the role of landowners in the listing process. In doing so, the Service has adopted an extraordinary position: that it is not bound by Congressional command but may instead rewrite the Endangered Species Act, without rulemaking and in the context of a private-party settlement agreement.

Appellants are four national, state and local membership associations, whose members are involved in building and developing land. (App. 13-15.) Appellants have an interest in ensuring that their members can use their property to the fullest extent allowed by law so that they may build and supply housing for all people throughout the United States. (App. 14.) Appellants' members have property that currently supports sensitive habitat and species that are listed as "endangered," "threatened," or are "candidates" for listing. (App. 15.) Consequently, these

---

[3] *See* Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; Expanding Incentives for Voluntary Conservation Acts Under the Endangered Species Act, 77 Fed. Reg. 15352-01, 15353 (March 15, 2012).

members participate in all aspects of the process for addressing the regulatory status of species under the Endangered Species Act. (App. 15.)

Appellants filed suit to protect their members existing and future conservation efforts, to prevent an expected increase in regulatory restrictions on their members' use of private land, and to avoid a reduction in the profitability of their members' business interests. Yet, according to the district court, these parties directly affected by the Settlement Agreements -- landowners and developers whose property is subject to the Endangered Species Act -- lack standing to challenge the agency's action. This conclusion is contrary to controlling case law and cannot be supported.

## A.      Statutory Background:  The Endangered Species Act

Under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("the Act"), a species will be added to the list of "endangered" species if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). An endangered determination is to be made by the Secretary "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of

habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas." 16 U.S.C. § 1533(b)(l)(A).

The Act provides that within 12 months of receiving a petition to have the species listed, the Service must complete its review and must make a finding that listing the species as endangered is either: (1) not warranted; (2) warranted (in which case the Service must publish a proposed rule to list the species in the Federal Register); or (3) warranted, but precluded by higher listing priorities.  16 U.S.C. § 1533(b)(3)(B).  If the Service decides a listing is warranted but precluded, the Act requires the Federal Register notice to include "a description and evaluation of the reasons and data on which the finding is based."  16 U.S.C. § 1533(b)(3)(B)(iii).  Such species are commonly known as a "candidate" species.[4]

The published findings supporting the Service's determination that listing is "warranted but precluded" are important to the regulated community.  They provide public notice of species that are likely to become the subject of proposed listing rules and allow public agencies, private landowners, and other interested parties to respond accordingly.

---

[4] According to the Service: "A candidate species is one for which we have on file sufficient information on biological vulnerability and threats to support a proposal to list as endangered or threatened, but for which preparation and publication of a proposal is precluded by higher priority listing actions."  75 Fed. Reg. 69222 (Nov. 10, 2010).

When the Service makes a warranted but precluded finding on a petition, the Act requires that the petition be treated as one that is resubmitted each year on the date of such a finding. 16 U.S.C. § 1533(b)(3)(C)(i). Thus, the cycle is repeated -- the Service must make findings on candidate species on an annual basis and again determine whether listing is (1) not warranted, (2) warranted, or (3) warranted but precluded.

The Service is required to have in place a "system to monitor effectively the status of all species with respect to which a "warranted but precluded finding is made. 16 U.S.C. § 1533(b)(3)(C)(iii). After the Service has published its decision that listing is warranted but precluded, it must show it is making "expeditious progress" to list, delist, or reclassify the species. 16 U.S.C. § 1533(b)(3)(B)(iii)(II). The Service is required to enact guidelines that set forth "a ranking system to assist in the identification of species that should receive priority review" for listing. 16 U.S.C. § 1533(h)(3).

Since 1975, the Service has published the Candidate Notice of Review ("Notice of Review") in the Federal Register.[5] The Notice of Review "summarizes the status and threats that [the Service] evaluated in order to determine that species

_____

[5] *See* Department of Interior, Endangered and Threatened Wildlife and Plants; Review of Native Species That Are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions, 76 Fed. Reg. 66370- 66439 (Oct. 26, 2011).

qualify as candidates and to assign a listing priority number to each species or to determine that species should be removed from candidate status."[6]   Of equal importance, the Notice of Review is designed:

> to provide advance knowledge of potential listings that could affect decisions of environmental planners and developers; to provide information that may stimulate and guide conservation efforts that will remove or reduce threats to these species and possibly make listing unnecessary; to request input from interested parties to help us identify those candidate species that may not require protection under the Act or additional species that may require the Act's protections; and to request necessary information for setting priorities for preparing listing proposals.

76 Fed. Reg. at 69370-71.  Thus, the Service uses the Notice of Review process to incentivize private landowners and local governments to set aside land to reduce threats to the species and to provide data and analysis concerning species status.[7] Such information and efforts are an essential part of the Service's efforts to lower the priority ranking of a species and to reduce threats so that the agency can focus on higher priorities.

The Notice of Review sets forth the listing priority number for each species. The listing priority number ranges from 1 to 12 depending on the magnitude of the threat, the immediacy of the threat and taxonomic status -- the lower the number, the higher the listing priority.  As required by Congress in 1983, the Service

---

[6] *Id.* at 69222.

[7]  The Service notes that the agency "strongly encourage[s] collaborative conservation efforts for candidate species, and offer[s] technical and financial assistance to facilitate such efforts."  76 Fed. Reg. at 66371.

published the Endangered and Threatened Species Listing and Recovery Priority Guidelines, 48 Fed. Reg. 43098 (September 21, 1983) (the "Guidelines"). As explained by the Service, "the listing priority number ranking system provides a basis for making decisions about the relative priority for preparing a proposed rule to list a given species."[8]

The listing priority process is essential given the Service's limited funding, and occasionally incomplete science. The listing priority process allows for analysis of the status of the species (often privately funded) and for long-range planning efforts to incorporate conservation measures that lessen the threats to species (either lowering priorities further or keeping the species off the list altogether).

Therefore, while candidate species do not receive the direct legal protections of listed species, their presence has an impact on land-planning given that these species by definition may warrant future protection under the Act. Furthermore, state and local land use agencies often develop species protection measures pertaining to candidate species to demonstrate that listing is not necessary.[9] Hence, it is a common and desired practice for Appellants' members to address the potential impacts to candidate species in long-range land-planning decisions. And,

---

[8] 76 Fed. Reg. at 66371.

[9] Listing determinations are made, in part, in consideration of the best scientific and commercial data available concerning efforts of state and local governments to protect species and habitat. *See* 16 U.S.C. § 1533(b)(l)(A).

where there is a project with a federal nexus, the Service itself encourages parties (both private parties and federal agencies) to identify candidate species and to plan for avoidance and mitigation. Thus, landowners routinely participate in all stages of the listing process and private property is affected by the decisions of the federal agencies as well as by local and state agencies, who also are influenced by the Service.

## B.      The Settlement Agreements

In June of 2010, two environmental advocacy groups, Wildearth Guardians and Center for Biological Diversity, filed a number of lawsuits against the Service and the Secretary of the Interior related to listing status decisions. These lawsuits were consolidated and transferred to the District Court of the District of Columbia as multidistrict litigation. *See In Re: Endangered Species Act Section 4 Deadline Litigation*, MDL No. 2165, Case No. 10-377 (D.D.C). On September 9, 2011, the United States District Court for the District of Columbia approved two separate stipulated settlement agreements between the Service and the advocacy groups (collectively the "Settlement Agreements" or "Agreements"). (*See* App. 34-74.) The Settlement Agreements fundamentally alter the manner and order in which the Service considers the status of 251 species, which has an immediate, collateral impact on the regulatory status of private property.

Specifically, these Agreements mandate the order in which the Service must submit proposed listing rules or not warranted findings to the Federal Register. (*See* App. 39-44.)  Rulemakings for the species must be undertaken in the order negotiated with the Advocacy Groups, with all candidate species rulemakings completed by September 30, 2016.  (*See* App. 40.)

By entering into the Agreements, the Service abandoned the statutorily required, public process for determining the priority of listing rulemakings for candidate species.  Under the Agreements, the Service will no longer consider whether listing is "warranted but precluded" for any candidate species that is slated for a rulemaking that year.  (*See* App. 40, 65.)  Therefore, the Service has agreed to limit itself to only 2 of the 3 choices it must consider under the Act.  By doing this, the Service has replaced the process established by Congress in favor of a ranking system chosen by the Advocacy Groups and has foregone the best available science in favor of closed room negotiations.  Absent the Agreements, there would be a different priority of listing determinations for several species, which would be based on the best available science and species priority ranking, not a negotiated timeline.  At the very least there would be further analysis of the species, relative priorities and efforts at conservation -- the end result of which is that private property would not be impacted if the statutorily required process was allowed to play out.

## C.     Case Proceedings

Following the Service's decision to enter into the Settlement Agreements, on December 17, 2012, Appellants filed their Complaint in this litigation.   The Complaint challenges the Service's decision to abdicate a statutorily mandated process based on best available science, public input and independent peer review in favor of a private settlement that lets two advocacy groups dictate the order and pace of its decision making process.   (App. 8, 25-26.)   It contains four counts alleging violations of the Endangered Species Act and the Administrative Procedure Act and seeks declaratory and injunctive relief to enjoin the Service's decision to set aside the law and its statutory obligations and enter into the Agreements with the Advocacy Groups.  (App. 27-29.)

The Complaint alleges that species subject to the Settlement Agreements are present and/or inhabit the property of Appellants' members. (App. 23.)  Therefore, Appellants' members are landowners who are directly affected by the presence of candidate species and species' habitat on their land, engage in conservation efforts to protect such species and habitat, are subject to local land use restrictions that stem from the presence of such species and their habitat, and otherwise work with the Service to protect candidate species.  (*See* App. 15-16, 23.)

Appellants' members have undertaken substantial efforts to provide information and scientific data concerning species threats and status and have

11

engaged in habitat conservation efforts to protect specific candidate species. (App. 15.)  These efforts include, but are not limited to, conducting research concerning species that live on their land and setting aside portions of land to be undeveloped in order to preserve specific candidate species and their habitats.  (App. 23.)  The Service's decision to enter into the Settlement Agreements has a significant impact and harm on Appellants' members and their various property interests.  (*See* App. 14.)

On March 27, 2013, the Service moved to dismiss the Complaint, arguing that Appellants lacked standing to challenge its decision to enter into the Agreements.  (App. 31.)  Appellants opposed this motion.  (App. 4.)  On March 31, 2014, the Court granted the Service's Motion to Dismiss.  (App. 135.)  The sole basis for the court's decision was that Appellants lacked standing to sue under Article III of the Constitution. (App. 136-61.)

The district court's decision relied heavily on a series of cases in which the District Court or U.S. Circuit Court of Appeals for the District of Columbia dismissed other parties' motions to intervene for lack of standing due to failure to show an injury. (App. 137-39.) (citing *In re Endangered Species Act Deadline Litig.*, 277 F.R.D. 1 (D.D.C. 2011), *aff'd* 704 F.3d 972 (D.C. Cir. 2013), *reh'g en banc denied* (Apr. 29, 2013); *In re ESA Section 4 Deadline Litig.* (*"Tejon Ranch"*), 270 F.R.D. 1 (D.D.C. 2010); *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317,

404 U.S. App. D.C. 395 (D.C. Cir 2013)).  The district court concluded that these four cases stand for the broad proposition that a party does not have standing when challenging a potential outcome, as opposed to an actual substantive outcome. (App. 137-39.)

Based on this conclusion, the district court held that because the Settlement Agreements "merely require the Service to determine -- according to a specific schedule -- whether listing of the species is warranted or not" and do not require a particular listing determination, the Appellants could not establish Article III standing.  (App. 147.)  Specifically, the district court held that:  Appellants did not establish that harm to their conservation efforts was fairly traceable to the Agreements or redressable by an order to set them aside;  any harm to Appellants' members'  property interests were caused by third-parties, rather than the Service and  the  Settlement  Agreements;    and  Appellants  failed  to  identify  a  listing procedure that the Agreements require the Service to violate, nor identify a listing procedure that is designed to protect their members' interests.  (App. 159.)

For these reasons, the district court dismissed Appellants' suit for lack of standing prior to reaching the merits of the claims. This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court below erred in holding that Appellants lack standing under Article III of the Constitution to challenge the Service's decision to enter into

Settlement Agreements, which are inconsistent with its statutory obligations. Under the district court's rationale, no party will ever have standing to challenge the extraordinary statutory rewriting that the Settlement Agreements represent.

By effectively writing the "warranted but precluded" species status out of the Endangered Species Act, the Service has caused a direct injury to Appellants property interests: landowners and developers are subject to greater restrictions on their property, habitat conservation efforts once encouraged by the Services are forfeited to the agency, and local land use decisions are influenced by the decisions of the Service concerning species status.  Such alleged injury is more than sufficient for Article III standing purposes.

## ARGUMENT

The district court's decision is inconsistent with a long line of cases from the Supreme Court and D.C. Circuit recognizing that an agency action that denies interested parties an available form of relief, or an opportunity to comment or advocate for a form of relief, causes harm to those parties and is subject to challenge.

The question presented in this appeal is not whether Appellants would have a right to compel the Service to maintain the relevant species in the "warranted but precluded" classification, but rather whether the elimination of that classification altogether causes the Appellants harm.  As to the latter, there can be no doubt that

14

the Appellants have been harmed: withdrawal of the "warranted but precluded" classification eliminates a process that Appellants are part of, renders Appellants' expenditures toward conservation of the relevant species -- made in consultation with the Service -- worthless, and makes it more likely that the relevant species will be listed, which will subject property owned or controlled by Appellants' members to significant new development restrictions.

This harm is sufficient to establish that Appellants have standing under Article III,[10] and the district court erred in holding otherwise.  Accordingly, its decision should be reversed.

## A.     Standard of Review

This Court reviews *de novo* a district court's decision to grant a motion to dismiss for lack of standing.  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  In analyzing whether a plaintiff has standing at the dismissal claim, the court must "accept[ ] as true all of the factual allegations contained in the complaint and draw[ ] all inferences in favor of the nonmoving party."  *Sherley v. Sebelius*, 610 F.3d 69, 71 (D.C. Cir. 2010); *see also Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003) (finding district court erred in dismissing claim

---

[10] This case raises only issues of Article III standing.  Associational standing is conceded and the zone of interests test is not relevant.  *See* Section B.2.

for lack of standing where it failed to accept plaintiff's allegations as true).  This Court has noted that, "[i]n reviewing the standing question, [the court] must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."  *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008).

To satisfy the "case" or "controversy" requirement of Article III, which is "the 'irreducible constitutional minimum'" of standing, a plaintiff must demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.  *National Ass'n of Home Builders v. EPA,* 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

## B.    The Injury-In-Fact Element of Article III Standing is Satisfied.

It is well-settled that, in cases alleging harms relating to a procedural violation by an agency, the "injury in fact" element of Article III standing is established if the plaintiff can identify a concrete interest that is or will be adversely affected by the denial of a procedural right.  *See, e.g.*, *Lujan*, 504 U.S. at 572 n. 7 ("[T]here is much truth to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."); *Safari Club*, 704 F.3d 972, 976 (D.C. Cir. 2013)

("An individual can enforce his procedural rights 'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'") (internal citations omitted); *TOMAC v. Norton*, 193 F. Supp. 2d 182, 187 (D.D.C. 2002) *aff'd sub nom. TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ("In a case like this one alleging procedural violations, the requisite showing of injury requires a demonstration that the challenged act performed with improper procedures will cause a distinct risk to plaintiff's particularized interests.")

Furthermore, this Court's precedents state that only an "identifiable trifle" is necessary to satisfy the injury-in-fact requirement. *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14 (1973)) (a plaintiff's injury "need not be large or intense; an 'identifiable trifle' . . . is sufficient to meet the constitutional minimum"); *Pub. Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C. Cir. 1977) ("An 'injury in fact' need not be substantial to support federal court jurisdiction over [a] challenge to agency action; an identifiable trifle will suffice.").

This standard is plainly satisfied here, when Plaintiffs' burden is the lowest, and the district court erred in holding that "Plaintiffs do not establish injury to their members sufficient for Article III standing."  (*See* App. 160.)

17

**1.     Appellants' Concrete Interests Are Affected by the Service's Action.**

The Service's actions in this case affect at least two concrete interests of Appellants: (i) their rights to develop property, which would be restricted if a relevant species is withdrawn from "warranted but precluded" classification and listed, and (ii) the value of expenditures made in conservation efforts that are forfeited when the relevant species are withdrawn from the "warranted but precluded" classification.

**a.     Property Interests**

First, courts have repeatedly recognized that the listing of a species causes direct and concrete harm to those owners or developers of property on which the subject species or their habitat[11] is present.  *See, e.g.*, *Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 714 F. Supp. 2d 73, 79-81 (D.D.C. 2010), *rev'd on other grounds and remanded*, 646 F.3d 914 (D.C. Cir. 2011) (finding plaintiffs had standing to challenge agency designation of plaintiffs' real property as "critical habitat" because designation set limitations on plaintiffs' ability to develop their property); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 529 F. Supp. 2d 1110, 1116 (N.D. Cal. 2007) *aff'd sub nom. Home Builders Ass'n of N. California v. U.S. Fish & Wildlife Serv.*, 321 F. App'x 704 (9th Cir. 2009) (listing of a species

---

[11] It is readily acknowledged that loss of habitat is the primary cause of most species' decline.  Therefore, protection and restoration of habitat is of foremost importance.

present on developers' property gave the developers standing because of the constraints placed on the use of the land by the regulation); *Markle Interests, LLC v. U.S. Fish & Wildlife Serv*., CIV.A. 13-234, 2014 WL 4186777 (E.D. La. Aug. 22, 2014) (same).  When a species is added to the list of "endangered" species, property owners' rights are significantly restricted, as Appellants have clearly alleged and the district court acknowledged in this case. (*See* App. 137.)

The limitations on property rights are more than sufficient to establish a concrete interest affected by the Service's action in this case.  Indeed, as this Court has acknowledged, "If the complainant is 'an object of the action (or forgone action) at issue' …there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'"  *Sierra Club v. Envt'l Protection Agency*, 292 F.3d 895, 900 (D.C. Cir. 2002); *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engrs.*, 417 F.3d 1272, 1286-87 (D.C. Cir. 2005) (describing it as "self-evident" that regulated parties and their representatives satisfy the requirements of Article III standing).

The district court dismissed Appellants' members' property interests as irrelevant for standing purposes because it assumed that there was no procedural harm and that the actual harm results only when the listing decision is made -- and not immediately after the species is withdrawn from the "warranted but precluded" classification.  (*See* App. 147.)  However, this fundamentally misapprehends the

appropriate inquiry -- whether or not Appellants' interests in use of their real property are concrete interests that are harmed by the Service's actions. Appellants' Complaint (alleging restrictions on land and forfeiture of conservation efforts,  (App. 10)), has met this standard.  *See Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv*., 529 F. Supp. 2d 1110, 1116 (N.D. Cal. 2007) *aff'd sub nom. Home Builders Ass'n of N. California v. U.S. Fish & Wildlife Serv*., 321 F. App'x 704 (9th Cir. 2009) ' " (finding plaintiffs' interest in the use of their real property to constitute a concrete interest); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 539 F. Supp. 2d 331, 339 (D.D.C. 2008) (same); *Barnum Timber Co. v. Envt'l Protection Agency*, 633 F.3d 894, 897-98 (9th Cir. 2011) (finding a reduction in property value to be an injury to plaintiff's concrete property interest); *Cnty. of San Miguel, Colo. v. MacDonald*, 244 F.R.D. 36, 44 (D.D.C. 2007) (intervenors "allegations of expected increase in regulatory restrictions on their members' use of public and private land, including their members' access to federal lands, impairment of their members' existing and future conservation efforts, and a reduction in the profitability of their members' business concerns, constitute concrete and imminent injuries.").

    In contrast, the rights of property owners to develop their property were not present in *Safari Club*.  The plaintiffs in *Safari Club* were recreational hunters who sought to delay listing in order to continue to hunt three species.  *See Safari Club*,

20

704 F.3d at 975 n. 1.  The hunting group had no apparent or alleged developmental rights in property at issue.  On this basis alone, *Safari Club* is distinguishable from the instant case and the district court erred in its reliance on it.  Whether Appellants' members' property interests are sufficiently linked to the Service's procedural violation is a separate inquiry, which can be addressed only by specific reference to that violation -- as discussed below.

### b.    Conservation Expenditures

It is equally clear that the expenditures made by Appellants, in an effort to protect species in the "warranted but precluded" classification, would be rendered worthless if that classification were no longer available.  This constitutes another direct harm to a concrete interest.

Appellants' members own land where species live and/or where there is habitat that the Service seeks to protect.  (*See* App. 143.)  In order to avoid the more onerous regulatory environment of ownership of property with endangered species or habitat present, private landowners such as Appellants' members expend considerable resources engaging in conservation efforts that reduce risk to candidate species.  (*See* App. 22-23.)[12]   These efforts also become part of regular

---

[12] As explained in *Defenders of Wildlife v. Jewell*, the Service has well-developed policies designed to "encourage states and private actors to undertake voluntary efforts to conserve candidate species -- those being considered for ESA listing." *Defenders of Wildlife v. Jewell,* — F. Supp. 3d —, CV 13-0919 (RC), 2014 WL

land planning activities engaged in by state and local agencies. Such private and public land preservation efforts are induced by the Service, which enjoy the benefit of species protection because it is able to focus limited resources on species that are of higher priority. These conservation investments are concrete interests that are impaired by the Settlement Agreements. (*See* App. 12.)

In addition to the allegations in Appellants' Complaint, Appellants offered two declarations to provide additional support to establish their standing.[13] Appellant Olympia Master Builders has engaged in considerable efforts to protect one candidate species, the Mazama Pocket Gopher, and has funded surveys and other scientific efforts. (*See* App. 85-87.) Further, one of its members explained specifically how he set aside land to conserve habitat for a candidate species subject to the Settlement Agreement and how the local land use authorities reacted to the Service's actions, resulting in forfeiture of his efforts. (*See* App. 91-92; 95-

---

4829089 at *1 (D.D.C. Sept. 30, 2014) (citing the Announcement of Final Policy for Candidate Conservation Agreements with Assurances, 64 Fed. Reg. 32,726, 32,727 (June 17, 1999)). Such efforts are designed to "remove any need to list the covered species" or, at the very least to provide "assurances from the Services that additional conservation measures will not be required . . . should the species become listed in the future." *Id.*

[13] The sworn statements in these declarations more than suffice to overcome a motion to dismiss for lack of standing, where the court is required to "accept[ ] as true all of the factual allegations contained in the complaint and draw[ ] all inferences in favor of the nonmoving party." *Sherley,* 610 F.3d at 71.

97.) (discussing costs, delays and modifications associated with the Agency's involvement in anticipation of listing caused by the Settlement Agreements).

Appellants' members, therefore, have a concrete interest in the conservation measures that they implement and in the development of data related to candidate species, which have resulted in significant benefits to the species. *See Safari Club Int'l v. Salazar*, 82 F.R.D. 32, 36, 41 (D.C. Cir. 2102) (finding standing in Endangered Species Act suit for organization that "advocates new approaches to wildlife conservation that protect endangered species and help keep other species from becoming endangered"); *Fund for Animals v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (finding organization had standing based on threatened harm to its conservation efforts). Private property owners who engage in voluntary conservation measures have the right to intercede to protect such efforts. *See Jewell,* 2014 WL 4829089 at *4 n. 7 (noting that the court granted the unopposed motions of Texas Comptroller of Public Accounts Susan Combs, the American Petroleum Institute, the Independent Petroleum Association of America, the New Mexico Oil and Gas Association, the Permian Basin Petroleum Association, and the Texas Oil & Gas Association to intervene as a matter of right based on their interests in several voluntary conservation plans that were utilized by the Service to withdraw a proposed rule that would have listed the dunes sagebrush lizard as endangered).

The district court suggested that Appellants' members' expenditures were irrelevant because they were "voluntary" and because the final listing decision had not yet been made.  (*See* App. 151.)[14]  Courts have recognized, however, that when expenditures are made pursuant to consultation with an agency, those expenditures -- even when technically "voluntary" -- are properly considered to be made in reliance on the agency's representations.  Therefore, they are properly deemed "harms" for Article III purposes when their value is lost.  *See, e.g.*, *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 560 (D. Vt. 2005) (finding plaintiffs to be injured when conservation efforts taken in reliance upon agency designation were rendered meaningless by subsequent agency decision).

Even if the conservation expenditures are deemed lost only upon a decision to list a species, that loss still qualifies as a concrete interest for these purposes, and the question then becomes whether the interest is sufficiently linked to the procedural violation, such that it can confer Article III standing.

### 2.    The Challenged Agency Action Denies Procedural Rights in a Manner That Directly Impact the Appellants' Interests.

Appellants' members' property interests and conservation expenditures are directly and adversely impacted by the Settlement Agreements in at least three ways:  (1) withdrawal of the "warranted but precluded" classification, (2) loss of an

---

[14] Again, there were no conservation expenditures at issue in either *Safari Club* or *Tejon Ranch*, and therefore, the district court erred in finding those decisions as controlling and dispositive.

opportunity to comment on priority issues, and (3) acceleration of the listing

determination.  Each of these procedural harms constitutes injury-in-fact sufficient

for Article III standing.  For each of these injuries,

> The hardship is the process itself. Process costs money. If a federal licensee must spend years attempting to satisfy an elaborate, shifting array of state procedural requirements, then he must borrow a fortune to pay lawyers, economists, accountants, archaeologists, historians, engineers, recreational consultants, environmental consultants, biologists and others, with no revenue, no near-term prospect of revenue, and no certainty that there ever will be revenue. Meanwhile, politics, laws, interest rates, construction costs, and costs of alternatives change. Undue process may impose cost and uncertainty sufficient to thwart the federal determination that a power project should proceed.

*Alaska Dep't of Envtl. Conservation v. Envt'l Protection Agency*, 540 U.S. 483, 516

(2004) (Kennedy, J., dissenting) (quoting *Sayles Hydro Associates v. Maughan*,

985 F.2d 451, 454 (9th Cir. 1993).

### a.    Withdrawal of "Warranted but Precluded" Classification

Withdrawal of the "warranted but precluded" classification for certain

species -- the result of the Service's Settlement Agreements -- directly threatens

Appellants' members' property interests and conservation expenditures by making

a listing decision not only more likely, but all but certain.

Indeed, there can be no doubt that listing is at least more likely without the

"warranted but precluded" classification.  As Congress intended, the Endangered

Species Act requires the Service to annually consider two potential, non-listing

classifications under several criteria: not warranted or "warranted but precluded". Yet, under the Settlement Agreements the Service has narrowed its options: the agency must decide if listing is warranted or not warranted.  In fact, it is hard to see how withdrawal of the "warranted but precluded" classification could result in anything other than listing for the relevant species.   By definition, the 251 candidate species at issue have already been deemed to warrant listing, with the listing decision withheld because of other agency priorities -- a consideration that is only applicable under the "warranted but precluded" classification.  Because under the Settlement Agreements that classification is no longer available and other agency priorities cannot be considered, in most if not all cases, the only decision the agency could make is to list the species.

The district court suggested that, because listing is not a certain or immediate result from withdrawal of the classification, the interests impacted by listing could not support standing to challenge the Settlement Agreements.  (*See* App. 147.)  This reflects a misunderstanding of the injury-in-fact requirement, specifically as applied in procedural rights cases: when there exists a "reasonable probability" that the procedural violation will impact a party's concrete interests, the violation qualifies as an injury in fact for Article III purposes. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 972 (9th Cir. 2003) (organization suffered injury in fact where it established reasonable probability that

26

new national forest management policies would threaten their concrete interest in enjoying national forests around the country); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992) (conferring standing to challenge a "failure to make wilderness recommendations," despite the fact that an injury-producing event "might never take place or that redrafting an environmental impact statement might not in any way change the Secretary's recommendations," because "[t]he nonwilderness recommendation is ... the primary factor making possible subsequent development"); *Sierra Club v. Marita*, 46 F.3d 606, 611 (7th Cir. 1995) (conferring standing to challenge forest plans as they "clearly require certain projects to be undertaken"); *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) ("That the Secretary may ultimately make the same decision and designate critical habitat within the same geographical parameters is immaterial; the County's alleged injury results from Secretarial failure substantively to consider the environmental ramifications of its actions.").[15]

---

[15] Some of this Court's decisions have suggested a stricter approach to injury in fact, *see, e.g. New World Radio, Inc. v. Fed. Commc'n. Comm'n.*, 294 F.3d 164, 172 (D.C. Cir. 2002) ("'chain of events' injury is too remote to confer standing"); *Nat'l Treasury Emp. Union v. United States,* 101 F.3d 1423, 1427 (D.C. Cir. 1996) (no standing based on injury not "certainly impending"). *See also Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir. 1994). However, even these decisions do not support finding that the injury alleged here, which is all but certain, is too speculative to confer standing.

Here, as discussed above, withdrawal of the "warranted but precluded" classification renders the listing decision and resulting harms to Appellants' interests not only reasonably probable but practically certain. (*See* App. 25.)

The Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997), confirms that a violation of this sort qualifies as an injury in fact. In *Bennett*, the Court upheld a challenge to issuance of a biological opinion letter, even though that opinion itself did not represent the final agency action that would produce adverse consequences, because the letter had a "coercive effect" on that agency action, rendering the consequences significantly more likely. 520 U.S. at 169. The Supreme Court also recognized this principle in *Lujan*, stating:

> "[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."

*Id.* at 561 n.7.

To hold, as the district court did, that Appellants in this case have not asserted a cognizable injury in fact is directly counter to these decisions.

### b.      Loss of Opportunity to Comment on Priority Issues and Realize the Benefits of Such Efforts

Withdrawal of the "warranted but precluded" classification denies the Appellants an opportunity to submit comments to the agency on issues of priority

or to advocate for withholding of a listing decision on the basis of their own conservation efforts or scientific research. (*See* App. 23, 26.) In effect, the Agreements result in forfeiture of the efforts of Appellants that the Act supports and the Service solicits.

The effects of the Act do not crystallize upon listing;p instead, there is an iterative process that involves landowners, the Service, and state and local governments. Through this process, when a species is added to the candidate list, the Service encourages landowners and local governments to engage in conservation activities designed to lessen the threats to species while allowing typical land use activities to go forward. (App. 23.) To further inform its decision-making process, the Service also relies on private groups to fund, develop and provide scientific studies and other information it needs to make accurate and appropriate listing decisions. *Id.*

Private landowners, therefore, often work with the Service and environmental groups toward the goal of implementing conservation measures that provide sufficient protection to the species so that more onerous restrictions under the Act might not be required. (*See* App. 23.) These conservation measures and research efforts serve the goals and interests of various players in the statutory scheme. On the one hand, they allow the Service to redirect its limited resources to protect species that face greater threats (the very purpose of the priority ranking

29

process).  (App. 22.)  And on the other, they provide a way for landowners and other interested parties, such as Appellants, to undertake long range planning activities with some level of assurances concerning the impact of species.  (App. 23.)  Finally, Appellants' efforts to provide data and challenge the Service's initial assessments of species' vulnerability ensure that the agency decisions are made on the best available science, as the statute requires.  (*See* App. 25.)

This relationship between the landowners and the Service is evidenced by the Service's own policies and procedures.  Before the Agreements were entered into, the Notice of Review process served as the Service's means of showing its math -- discussing the status of candidate species, threats they face, data gaps, conservation measures, and their ranking -- while attempting to get landowners and local governments to take further action to remove threats to the species so that they do not have to be listed.  77 Fed. Reg. 69994.  Indeed, the Service explains that it seeks (1) to "stimulate and guide conservation efforts that will remove or reduce threats to these species and possibly make listing unnecessary," (2) "input from interested parties to help us identify those candidate species that may not require protection under the Act," and (3) "necessary information for setting priorities for preparing listing proposals."  76 Fed. Reg. at 69370-71.  Because it hopes to keep species off the list, the Service "strongly encourage collaborative conservation efforts for candidate species."  *Id.* at 66371.  Indeed, the Service has

explained that this process will "assist environmental planning efforts" such as those engaged in by Appellants' members, counting on "landowners and resource managers to alleviate threats and thereby possibly remove the need to list species as endangered or threatened."  *Id.* at 66370.

The Service makes clear that private parties engaging in conservation activities for candidate species is consistent with the purposes of the Act:

> It is possible that voluntary conservation actions for unlisted species might lead to a determination that a particular species does not need to be listed.  <u>If the need to list a species under the ESA can be avoided, everyone benefits.</u>  The species benefit from early action to address threats to their survival.  <u>Landowners and other regulated interests avoid the imposition of potentially costly restrictions on their activities.</u> The Service avoids the need to dedicate scarce conservation dollars to additional species.  The States maintain their primary management authority over non-listed species, ensuring that local authorities respond to local problems with input from their residents.[16]

Moreover, the Service has proposed a rulemaking to ensure that efforts such as those engaged in by Plaintiffs are of benefit to the landowner if the species is listed.   In its proposal the Service said that it wants to:

> assure those who take such voluntary actions that the benefits of such voluntary conservation actions will be recognized as offsetting the adverse effects of activities carried out after listing by that landowner or others.  This practice sometimes referred to as "advance mitigation" or "pre-listing mitigation," is intended to encourage early

_____

[16] 77 Fed. Reg. at 15352 (emphasis added).

31

> conservation efforts that could reduce or eliminate the
> need to list species as endangered or threatened.

*Id.* at 15353.[17] *See also* Proposed Policy Regarding Voluntary Prelisting Conservation Agreements, 79 Fed. Reg. 42525 (July 22, 2014) ("The purpose of the policy is to incentivize voluntary conservation efforts on behalf of species *before* they are listed, and to clarify the manner in which the Service "will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation" under section 7(a)(2) or 7(a)(3) of the Act…") (emphasis added). Thus, the Service itself has expressed concern with the very predicament that Appellants seek to prevent here: a sudden change of status from "warranted but precluded" to "warranted" may eliminate the intended benefits the landowner gets from conservation activities that the Service itself induced.

Thus, it is unquestionable that the Act incentivizes private landowners to set aside land to reduce threats and to provide information concerning species status before they are listed. Such efforts are relevant to the required 12-month review, 16 U.S.C. § 1533(b)(3)(C)(i), the system to rank the species by priority, 16 U.S.C. § 1533(h), and the overall requirement to ensure that listing decisions are based on the best scientific and commercial data available, 16 U.S.C. § 1533(b)(1)(A). (*See*

---

[17] Regardless of whether this proposal becomes final, it is clear that the work of Appellants is both consistent with the Endangered Species Act and sought after by the Service.

App. 16.)  As set forth in the Complaint, Plaintiffs and Plaintiffs' members have participated in the listing process described above by spending considerable resources towards candidate species science and conservation activities.  (*See id.*). These resources are effectively sacrificed due to the Settlement Agreements.

These Appellants' conservation efforts obviously put them in a different position than Safari Club, who asserted "an interest in hunting the three species during the Service's delays in listing those candidate species."  *Safari Club,* 704 F.3d at 976.  Consistent with the Act, Appellants' efforts result in significant benefits to the species.  In fact, it is unclear how Appellants' standing would be any different than the Advocacy Groups.  In many ways, Appellants' role in the Act's listing process is much more particularized and direct than such litigious environmental  groups -- species live on Appellants' members land, Appellants fund research, and Appellants set aside real property to conserve species and their habitat.  (*See* App. 23.)  It is counterintuitive and puzzling that the standing of the Advocacy Groups in this overall matter has been assumed and never challenged, while Appellants, who have proven their environmental credentials with a real investment in this process, have been denied standing.

Courts have consistently recognized that denial of an opportunity to comment or to advocate for a position, when the contrary position -- here, listing -- would carry adverse consequences to concrete interests, qualifies as an injury in

33

fact for Article III purposes.  *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1012-13 (D.C. Cir. 2014) ("Plaintiffs asserting a procedural rights challenge need not show the agency action would have been different had it not been consummated in a procedurally valid manner . . . plaintiffs simply need to show the agency action affects their concrete interests in a personal way."); *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1483-84 (D.C. Cir. 1994) (finding plaintiff had standing in suit against Federal Highway Administration because challenged rule was promulgated without notice and comment); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446 (9th Cir. 1994) (finding plaintiffs were injured when agency failed to follow notice and comment procedures that protected plaintiffs' concrete and personal interests).

Neither of the two reasons offered by the district court for discounting the denial of this opportunity as a cognizable injury -- that (1) the Appellants could later submit comments opposing the listing decision, and (2) the statute does not provide a formal right to comment -- are valid.

While the Appellants might later submit comments opposing an individual listing decision, they could not at that time raise issues relating to priority, as those issues are relevant only to the "warranted but precluded" classification, which has been removed from the Service's consideration under the Settlement Agreements. In other words, the only opportunity for Appellants to argue that listing precluded

by other priorities is when the Service may be considering a "warranted but precluded" classification; if that classification cannot be considered, Appellants are barred from making those arguments.  Under these circumstances -- where a party's opportunity to raise a relevant objection would otherwise be effectively waived -- courts have held that denial of the opportunity to comment constitutes a cognizable injury in fact.  *See Marita*, 46 F.3d at 611 ("Once the plan has passed administrative review, the procedural injury has been inflicted. Unless a plaintiff's purported interest in the matter is wholly speculative, waiting any longer to address that injury makes little sense.").[18]

And the district court's assessment of whether the Act provides a formal right to comment is a question for the merits, not standing.  At the motion to dismiss stage, a plaintiff's non-frivolous contention regarding the meaning of a statute must be taken as correct for purposes of standing. *See Louisiana Energy & Power Auth. v. Fed. Energy Regulatory Comm.*, 141 F.3d 364 (D.C. Cir. 1998). Therefore, the district court should have accepted that such a right exists.

Regardless even if not formally allowed, in practice the Service has solicited and considered input and advocacy on priority issues, vesting the Appellants with a

---

[18] If the Service had properly utilized the APA and issued a rule indicating that it would no longer place species on the "warranted but precluded" list and no longer prioritize species, it would be apparent that Appellants have standing to challenge such a rule.  The Service has done exactly this through the Settlement Agreements.

legitimate and reasonable expectation that they will be allowed to present comments in support of "warranted but precluded" classification.

### c.    Acceleration of Listing Decision

Withdrawal of the "warranted but precluded" classification also accelerates the timing of the listing decision, and for that additional reason constitutes an injury in fact.  In the absence of the Settlement Agreements, many if not all of the relevant species would have remained in the "warranted but precluded" classification for the foreseeable future, allowing Appellants to avoid the adverse consequences associated with listing for a greater period of time -- perhaps indefinitely -- and utilize their land under the regulatory environment of a candidate species. (*See* App. 25.)[19]   In light of the Settlement Agreements, however, the listing decision will be made in relatively short order, exposing Appellants to those consequences sooner.  (*See* App. 92-97.)

The timing of an agency decision to apply its regulatory authority certainly has an impact on regulated entities.  While the district court asserted that "delay" in the listing decision was not a valid interest for these purposes, this simply ignores

---

[19] The presumption that elimination of the "warranted but precluded" category is superfluous to the Endangered Species Act regulatory process wrongly seems to suggest that Congress promulgated this provision by accident. The reality, however, is that the option of declaring a species status to be "warranted but precluded" is an essential consideration that benefits the Service by allowing it to prioritize its resources, benefits candidate species where land is set aside for their protection, and benefits landowners, who may engage in long-term land planning processes with some degree of regulatory certainty.  77 Fed. Reg. at 15352

the real and substantial benefits that the appellants obtain as a result of that delay. (App. 95-98.) (discussing the coercive effect of the Service and the Agreements). Other courts have indeed recognized explicitly that "delay" in an agency decision alone can qualify as an injury in fact, if linked (as here) to concrete interests. *See, e.g.*, *Nat'l Parks Conservation Assoc. v. U.S. Envt'l Protection Agency,* 759 F.3d 969, 975 (8th Cir. 2014) (finding that a regulated entity satisfied the standing requirements because if it prevailed it would "at least delay[]" the installation of costly technologies).

### 3. "Zone of Interests" Considerations Provide No Basis to Deny Standing.

The "zone of interests" test is inapplicable here, and provides no basis to deny standing. The Supreme Court has explicitly held that the language of the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540, "negates the zone-of-interests test." *Bennett*, 520 U.S. at 164. Because Appellants' claim was brought under this provision, these "interest" considerations are inapplicable.

The district court, following this Court's decision in *Safari Club*, relied substantially on these considerations in denying standing. It concluded, for

example, that standing is lacking because the Act's listing procedures are not "designed to protect [the appellants'] members' interests."[20]

While these considerations may be relevant in cases like *Safari Club*, that are not brought pursuant to the citizen-suit provision of the Act, they are not relevant here. *See Fund For Animals,* 322 F.3d at 734 ("In *Bennett v. Spear*, the Supreme Court held that the broad language of the citizen-suit provision of the ESA ... 'negates the zone-of-interests test' and expands standing 'to the full extent permitted under Article III.'"); *see also Bonnichsen v. United States*, 367 F.3d 864, 873-74 (9th Cir. 2004).

However, even if this Court decides that the "zone of interests" test applies to citizen-suit provisions of the Act, the test is satisfied in this case.

The proper "zone of interests" inquiry is not, as the district court assumed, whether the provision at issue was designed to protect the particular interests of the plaintiff but, rather, whether the subject of "the plaintiff's grievance ... arguably fall[s] within the zone of interests protected or regulated by the statutory provision." *Bennett*, 520 U.S. at 162.  Whether or not these particular provisions were *designed* to benefit these particular appellants, or to *expressly* provide them

---

[20] In its reasoning, the district court cited to *Safari Club*, in which this Court referred to the lack of any express statutory provision granting a right to review or otherwise protecting the appellants' interests.   .

with a right of action, they clearly do regulate the matters that are the subject of the cause of action: the classification of species.

Yet, rather than considering this, the district court focused its inquiry on Appellants status as landowners and developers, presumably as opposed to environmental groups. (*See* App. 155-59.) This distinction was explicitly rejected in *Bennett* as an improper application of the zone-of-interests test. *Bennett*, 520 U.S. at 166 ("[t]he citizen-suit provision does favor environmentalists in that it covers all private violations of the ESA but not all failures of the Secretary to meet his administrative responsibilities; but there is no textual basis for saying that its expansion of standing requirements applies to environmentalists alone."); *see also Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488-89 (1998) ("[O]ur prior cases ... establish that we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff.").

If the environmental groups had standing to bring the original challenge to the Service's application of the "warranted but precluded" classification, so, too, do these Appellants, who set aside land and provide funding for research as direct participants in the listing processes.

**D.     The Causation Element of Article III Standing is Satisfied.**

The causation element of Article III requires only that the plaintiff show that the asserted injuries are "fairly traceable" to the challenged action. *See Bennett,* 520 U.S. at 167. Indeed, the requirements for demonstrating causation in cases alleging a procedural harm are relaxed. *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C. Cir. 1996) (en banc).

The "fairly traceable" standard is plainly satisfied here. As explained above, by withdrawing the "warranted but precluded" classification, the Service has effected a forfeiture of all efforts of Appellants designed to maintain the species candidate status and made it not only more probable but practically certain that the relevant species will be listed, impacting the Appellants' property interests. (*See* App. 25.)

The district court concluded that the injuries here were not traceable to the Settlement Agreements because, although the Agreements withdrew the "warranted but precluded" classification, they did not themselves cause harm to the Appellants. (*See* App. 152.) This precise argument was rejected in *Bennett*, which clarified that the challenged action need not be the "last step in the chain of causation" in order to be "fairly traceable" to that action. (*Id.* at 167.)

Indeed, opinions of the Supreme Court compel a finding that causation is satisfied. In *Bennett,* the Court held that the Service's issuance of a biological

40

opinion, which recommends a course of action but does not actually implement that course or require any action, is nevertheless a "cause" of potential harms that would result from the action if the opinion "play[ed] a central role in the ... decision making process" and thus had a "coercive effect" on the action. *Bennett*, 520 U.S. at 169. *See also Lujan*, 504 U.S. at 561 n. 7. Other circuits have followed this same approach. *See, e.g. Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 972 (9th Cir. 2003).

Here, withdrawal of the "warranted but precluded" classification will have a "coercive effect" on the regulatory status of Appellants' property insofar as it removes the only barrier -- the priority considerations -- that previously required withholding of listing. As discussed in one of Appellants' Declarations, there is a demonstrable change in both the Service and the local land use authorities once a species is moved from a candidate species to proposed for listing. (*See* App. 95-97.) (explaining how the Settlement Agreements have impacted the permitting process on development projects in Washington state).[21] To hold that the injuries

---

[21] The coercive effect of listed species within the Act on local government decisions is well known. *See e.g. Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) (holding that state's licensing of commercial fishing made the Massachusetts fishery agency itself liable for "take" of right whales caused by fishermen); *Loggerhead Turtle v. Volusia*, 148 F.3d 1231 (11th Cir. 1998) (upholding plaintiff's ability to proceed against county for inadequate regulation of artificial beachfront lighting as constituting a "take" of sea turtles under § 9 under the Act);

asserted by Appellants in this case are not "fairly traceable" to the challenged action would be directly counter to the case law and documented occurrence of the impact.[22]

## E.    The Redressability Element of Article III  Standing is Satisfied.

The redressability element of Article III requires only that the plaintiff show that, if relief is granted, it is "likely[ ] as opposed to merely speculative[ ] that the injury will be redressed."  *See Bennett*, 520 U.S. at 167. Again, the requirements for demonstrating redressability in cases alleging a procedural harm are relaxed. *Fla. Audubon,* 94 F.3d 658.

Redressability is plainly established here:  reinstatement of the "warranted but precluded" classification, and vacation of the Settlement Agreements' requirement that the Service consider the identified species for listing according to

*Pac. Rivers Council v. Brown,* No. CV 02-243-BR, 2002 WL 32356431 (D. Or. Dec. 23, 2002) (denying motion to dismiss case arising under § 9 of the Act against the State of Oregon Forester regarding his approval of timber harvest plans).

[22] The status quo is clearly changed because the Service can no longer find that listing is warranted but precluded for these species and therefore the species on Appellants' members' land will no longer be a candidate species. (*See* App. 22.) All parties will alter their behavior accordingly. As property owners on whose land species and their habitat is present, there is little question that a change in the regulatory status of that property will help or hurt their interests.  (*See* App. 23.) Appellants have a fundamental right to challenge that change even if listing is not certain to occur.  *Idaho Power Co. v. Fed. Energy Regulatory Comm.*, 312 F.3d 454, 460 (D.C. Cir. 2002) (upholding Idaho Power's standing to challenge a FERC regulation that could have resulted in lost revenue, and noting that "an agency ruling that replaced a certain outcome with one that contains uncertainty causes an injury that is felt immediately and confers standing")
.

a pre-negotiated timetable, would restore the statutorily mandated, public review process for candidate species and allow Appellants to benefit from their efforts. The district court suggested that redressability was lacking because the Service might ultimately decide to list the relevant species, even if the "warranted but precluded" classification is available.  (*See* App. 150-51.)

However, particularly in a procedural rights case, the mere possibility that the agency might ultimately choose to take action that produces the asserted injuries does not undermine redressability.  *See Bennett*, 520 U.S. at 167-70; *Sugar Cane Growers Co-op. of Fl. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002) (plaintiff not required in procedural rights case to show agency's result would have been different to meet redressability requirement).  Reinstatement of the "warranted but precluded" classification will eliminate a "coercive factor" that would contribute to a listing decision, and thus is at least "likely" to redress the asserted injuries -- even if it is not certain to do so.

The Supreme Court has relied on this principle in numerous procedural rights cases, including among others *Massachusetts v. Envt'l Protection Agency*, 549 U.S. 497 (2007), and *Bennett v. Spear*, 520 U.S. 154 (1997).  For example, in *Massachusetts v. Envt'l Protection Agency*, the Court found that the petitioners had met Article III's redressability requirements, where they showed that regulating greenhouse gas emissions had the potential to slow or reduce global warming, even

though it would not by itself reverse global warming. *See also Lujan*, 504 U.S. at 561 n.7; *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001) ("[T]o establish standing, the birdwatchers need not show that the revised environmental impact statement would result in the abandonment of the plans to build the marine container terminal. Relying on the discussion of procedural standing in footnote seven of *Defenders of Wildlife,* we have held that to establish redressability plaintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them.").

To hold that the injuries asserted by Appellants in this case are not redressable would again be directly counter to all of these decisions.

* * *

In sum, "[n]o one pretends that judicial review of agency action is a pleasant day at the beach for agencies, and although escaping judicial review would of course be less [disruptive to the agency] . . ., it would also leave regulated entities . . .unprotected from arbitrary and capricious agency action." *Safe Extensions, Inc. v. Fed. Aviation Admin.*, 509 F.3d 593, 602 (D.C. Cir. 2007).

## CONCLUSION

For the foregoing reasons, Appellants have sufficiently alleged that they have Article III standing and the district court erred in granting the Service's Motion to Dismiss.

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/
_____

Rafe Petersen (Bar # 465542)
800 17th Street NW, Ste 1100
Washington, D.C. 20006
(202) 955-3000 Phone
(202) 955-5564 Fax
Rafe.petersen@hklaw.com
*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Appellants' Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(a).  Excluding the Table of Contents, Table of Authorities, the Glossary, the Statement of Pertinent Statutes and Regulations, and counsel's Certificates, this Brief contains 10,652 words, including footnotes.  This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface in Microsoft Word 2013 using Times New Roman, 14-point font.

Dated:  November 7, 2014                                   Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/
_____
Rafe Petersen (Bar # 465542)
800 17th Street NW, Ste 1100
Washington, D.C. 20006
(202) 955-3000 Phone
(202) 955-5564 Fax
Rafe.petersen@hklaw.com
*Counsel for Appellants*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of November 2014, a true and correct

copy of the foregoing was served via ECF and messenger upon the following:


Nicholas Andrew DiMascio
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Counsel for United States Fish*
*and Wildlife Service and Sally Jewel,*
*in her official capacity as Secretary,*
*U.S. Department of the Interior*


Respectfully submitted,

HOLLAND & KNIGHT LLP

   /s/
_____
Rafe Petersen (Bar # 465542)
800 17th Street NW, Ste 1100
Washington, D.C. 20006
(202) 955-3000 Phone
(202) 955-5564 Fax
Rafe.petersen@hklaw.com
*Counsel for Appellants*

47

## ADDENDUM: PERTINENT STATUTES AND REGULATIONS

## TABLE OF CONTENTS

A.      Article III, U.S. Constitution……………………………………..…Add. 1

B.      Endangered Species Act,
        16 U.S.C.A. §§ 1532, 1533, 1540………..……………………………Add. 1

        1.      16 U.S.C.A. §1532…………………………………………..… Add. 1

        2.      16 U.S.C.A. §1533………………………………………...…Add. 5

        3.      16 U.S.C.A. §1540…………………………….……………Add. 16

## A.    Article III, U.S. Constitution

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States;--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.  U.S. Const., Article III, Sec. 2.

## B.    Endangered Species Act, 16 U.S.C. §§ 1532, 1533, 1540

## 1.    16 U.S.C. § 1532:  Definitions

For the purposes of this Act--

(1)    The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

(2)    The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: Provided, however, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

(3)    The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

(4)    The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

Add. 1

(5)     (A) The term "critical habitat" for a threatened or endangered species means—

(i)   the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act, on which are found those physical or biological features

(I) essential to the conservation of the species and

(II) which may require special management considerations or protection; and

(ii)  specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act, upon a determination by the Secretary that such areas are essential for the conservation of the species.

(B)   Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

(C)   Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

(6)     The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this Act would present an overwhelming and overriding risk to man.

(7)     The term "Federal agency" means any department, agency, or instrumentality of the United States.

(8)     The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

(9)    The term "foreign commerce" includes, among other things, any transaction-

(A)  between persons within one foreign country;

(B)  between persons in two or more foreign countries;

(C)  between a person within the United States and a person in a foreign country; or

(D)  between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

(10)   The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

. . .

(12)   The term "permit or license applicant" means, when used with respect to an action of a Federal agency for which exemption is sought under section 7, any person whose application to such agency for a permit or license has been denied primarily because of the application of section 7(a) to such agency action.

(13)   The term "person" means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

(14)   The term "plant" means any member of the plant kingdom, including seeds, roots and other parts thereof.

(15)   The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this Act and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

(16)   The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

(17)   The term "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(18)   the term "State agency" means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

(19)   The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(20)   The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

(21)   The term "United States", when used in a geographical context, includes all States.

**2.    16 U.S.C. § 1533: Determination of Endangered Species and Threatened Species**

(a)    Generally.

(1)    The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A)    the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)    overutilization for commercial, recreational, scientific, or educational purposes;

(C)    disease or predation;

(D)    the inadequacy of existing regulatory mechanisms; or

(E)    other natural or manmade factors affecting its continued existence.

(2)    With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970--

(A)    in any case in which the Secretary of Commerce determines that such species should--

(i)    be listed as an endangered species or a threatened species, or

(ii)    be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;

(B)    in any case in which the Secretary of Commerce determines that such species should--

(i)    be removed from any list published pursuant to subsection (c) of this section, or

(ii)    be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C)    the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3) (A)      The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable--

(i)      shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii)     may, from time-to-time thereafter as appropriate, revise such designation.

(B)(i) The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 101 of the Sikes Act (16 U.S.C. 670a), if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

(ii)     Nothing in this paragraph affects the requirement to consult under section 7(a)(2) with respect to an agency action (as that term is defined in that section).

(iii)    Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 9, including the prohibition preventing extinction and taking of endangered species and threatened species.

(b)    Basis for determinations.

(1) (A)    The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply,

Add. 6

or other conservation practices, within any area under its jurisdiction, or on the high seas.

(B)    In carrying out this section, the Secretary shall give consideration to species which have been--

(i)    designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii)    identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

(2)    The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

(3) (A)    To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, United States Code, to add a species to, or to remove a species from, either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B)    Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i)    The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii)    The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii)    The petitioned action is warranted, but that--

(I)    the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II)    expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of the Act are no longer necessary, in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C) (i)  A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii)  Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii)  The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7 to prevent a significant risk to the well being of any such species.

(D)(i)   To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, United States Code, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii)    Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

(4)    Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5, United States Code (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this Act.

(5)    With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3), the Secretary shall--

(A)    not less than 90 days before the effective date of the regulation--

(i)    publish a general notice and the complete text of the proposed regulation in the Federal Register, and

(ii)    give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

(B)    insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

(C)    give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

(D)    publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

(E)    promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

(6)(A)   Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register--

(i)      if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either--

(I)      a final regulation to implement such determination,

(II)     a final regulation to implement such revision or a finding that such revision should not be made,

(III)    notice that such one-year period is being extended under subparagraph (B)(i), or

(IV)    notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

(ii)     subject to subparagraph (C), if a designation of critical habitat is involved, either--

(I)      a final regulation to implement such designation, or

(II)     notice that such one-year period is being extended under such subparagraph.

(B)(i)   If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

(ii)     If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been

withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

(iii)    If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

(C)    A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that--

(i)    it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

(ii)    critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(7)    Neither paragraph (4), (5), or (6) of this subsection nor section 553 of title 5, United States Code, shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if--

(A)    at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

(B)    in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register.

Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8)    The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this Act shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

(c)    Lists.

(1)    The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b).

(2)    The Secretary shall--

(A)    conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B)    determine on the basis of such review whether any such species should-

(i)    be removed from such list;

Add. 12

(ii)    be changed in status from an endangered species to a threatened species; or

(iii)    be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b).

(d)    Protective regulations. Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1), in the case of fish or wildlife, or section 9(a)(2), in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 6(c) of this Act only to the extent that such regulations have also been adopted by such State.

(e)    Similarity of appearance cases. The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to section 4 of this Act [this section] if he finds that--

(A)    such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B)    the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C)    such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this Act.

(f)    Recovery plans.

(1)    The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section,

unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable--

(A)   give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B)   incorporate in each plan--

(i)   a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii)   objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii)   estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2)   The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

(3)   The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4)   The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5)     Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

(g)     Monitoring.

(1)     The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this Act are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c).

(2)     The Secretary shall make prompt use of the authority under paragraph 7 [(7)] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

(h)     Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments. The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to--

(1)     procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

(2)     criteria for making the findings required under such subsection with respect to petitions;

(3)     a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

(4)     a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

(i)     Submission to State agency of justification for regulations inconsistent with State agency's comments or petition. If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency

Add. 15

to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3), the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

## 3.    16 U.S.C.A. § 1540:  Penalties and Enforcement

…

(g)    Citizen Suits

(1)    Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf--

(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

(B) to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the taking of any resident endangered species or threatened species within any State; or

(C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court

finds that the allegation that an emergency exists is supported by substantial evidence.

(2)     (A)  No action may be commenced under subparagraph (1)(A) of this section--

(i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

(ii) if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

(iii) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

(B)    No action may be commenced under subparagraph (1)(B) of this section--

(i) prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species in the State concerned; or
(ii) if the Secretary has commenced and is diligently prosecuting action under section 1535(g)(2)(B)(ii) of this title to determine whether any such emergency exists.

(C)    No action may be commenced under subparagraph (1) (C) of this section prior to sixty days after written notice has been given to the Secretary; except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants.

(3)     (A)    Any suit under this subsection may be brought in the judicial district in which the violation occurs.

(B)    In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

(4)      The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

(5)      The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).